# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **ROGER A. SHULER, individually and on behalf of all others similarly situated,** | ) ) ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **NATIONAL ARBITRATION FORUM, INC.; NATIONAL ARBITRATION FORUM, LLC; DISPUTE MANAGEMENT SERVICES, LLC, d/b/a FORTHRIGHT; MANN BRACKEN, LLP; FIA CARD SERVICES, N.A., f/k/a   MBNA AMERICA BANK, N.A.; and PORTFOLIO RECOVERY SERVICES, INC.,** | ) ) ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) |

## CLASS ACTION COMPLAINT
### Jury Trial Demanded

## I.    PRELIMINARY STATEMENT

1.      Plaintiff Roger A. Shuler ("Shuler" or "the Plaintiff") files this Complaint individually and on behalf of similarly situated debtor individuals pursuant to Fed.R.Civ.P.23, against National Arbitration Forum, Inc.; National Arbitration Forum, LLC; Dispute Management Services, LLC, d/b/a Forthright; Mann Bracken, LLP; Portfolio Recovery Associates, LLC, FIA Card Services, N.A., f/k/a MBNA American Bank, N.A., (collectively, the "Defendants").   The substantive claims arise out of illegal activities prohibited by the Racketeer Influenced  and Corrupt Organizations Act (18 U.S.C. ' 1961 *et*

*seq.*)("RICO"), and other unlawful acts and omissions outlined herein that have proximately caused damage and injury to Plaintiff and the class members.

## JURISDICTION

### Subject Matter

2.      This Court has jurisdiction over the subject matter because the claims arise out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, specifically, 18 U.S.C. §§ 1964(a) and (c) and the due process clause of the United States Constitution under the Fourteenth Amendment; and 28 U.S.C. § 1331.  Those matters arise under the laws of the United States.  This Court also has supplemental  jurisdiction, pursuant to 28 U.S.C. § 1367, because the state law claims are so related to the Federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) in this district as this district is where defendant National Arbitration Forum, Inc. is located, and a district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## DEMAND FOR JURY TRIAL

4.      Plaintiff demands a trial by jury on all counts so triable.

## NATURE OF THE ACTION

5.     This class action is brought to redress violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and for other unlawful acts or omissions that have proximately caused damage and injury to, and resulted in a loss of property of, Plaintiff and the class members.

6.     The Plaintiff is a consumer, who like most Americans, has purchased goods and services through the extension of credit.

7.     One of the Defendants herein, FIA Card Services, N.A., f/k/a MBNA America Bank, N.A. ("MBNA"), was in the business of extending credit to consumers through the issuance of credit cards.  One such card was issued to the Plaintiff.

8.     MBNA routinely incorporated provisions into its agreements with consumers that any disputes would be submitted to one of the other Defendants, the National Arbitration Forum ("The Forum").  MBNA, or its purported assignee herein, Portfolio Recovery Associates, Inc. ("Portfolio Recovery"), has claimed the Plaintiff was subject to such procedure.

9.     MBNA, or its assignee, Portfolio Recovery, initiated an arbitration claim against the Plaintiff before The Forum through its collection agency/attorneys, Mann Bracken, LLP ("Mann Bracken"), or one of the entities that merged into Mann Bracken, Eskanos & Adler of California.

10.     The Forum represents to the public, the courts, and consumers that it is independent, operates like an impartial court system, and is not affiliated with any party. The

3

Plaintiff and other consumers do not know that The Forum works alongside creditors behind the scenes—against the interests of consumers—to convince creditors to place mandatory predispute arbitration clauses in their customer agreements and to appoint The Forum as the arbitrator of any disputes that may arise in the future. The Forum does this so that creditors will file arbitration claims against consumers in The Forum, thereby generating revenue for all the Defendants as is hereinafter more particularly described as the "Collection Enterprise."

11.     Portfolio Recovery, as assignee of MBNA, obtained an Order from The Forum on September 10, 2008 finding, among other things, that the Plaintiff owed $19,887.84 as a result of an alleged breach of his agreement with MBNA.  The arbitrator was William Ratliff of Wallace, Jordan, Ratliff & Brandt, LLC.

12.     In reality the Plaintiff was deprived of any right to submit any dispute with MBNA or its successors to an independent, neutral and unbiased alternative dispute resolution system.

13.     The consumer also does not know—and The Forum hides from the public—that The Forum is financially affiliated with a New York hedge fund group that owns one of the country's major debt collection enterprises. Beginning in 2006 and through 2007, Accretive, LLC (a family of New York hedge funds under the control of an investment manager named J. Michael Cline and his associates), engineered two transactions. In the first transaction, Accretive formed several private equity funds under the name "Agora" (meaning

4

"Forum" in Greek), which in turn invested $42 million in the National Arbitration Forum and obtained governance rights in it. In the second transaction, three of the country's largest debt collection law firms (Mann Bracken of Georgia, Wolpoff & Abramson of the District of Columbia, and Eskanos & Adler of California) merged into one large national law firm called Mann Bracken, LLP. Accretive then formed and funded (partly using federal money from the U.S. Small Business Administration) a debt collection agency called Axiant, LLC, which acquired the assets and collections operations of Mann Bracken.

14.     Through these transactions, the Accretive hedge fund group simultaneously took control of one of the country's largest debt collectors and became affiliated with The Forum, the country's largest debt collection arbitration company. In 2006, The Forum processed 214,000 consumer debt collection arbitration claims, of which 125,000—or nearly 60 percent—were filed by the law firms listed above. The Forum conceals its affiliations with the collections industry through extensive affirmative representations, material omissions, and layers of complex and opaque corporate structuring.

15.     Consumers also do not know that—despite representing to the public that it has "no relationship with any party" and does not "counsel our users"—The Forum works closely with creditors behind the scenes to: (1) encourage them to file arbitration claims as an alternative way to collect debt from consumers; (2) draft arbitration clauses, advise creditors on arbitration legal trends, and in some cases, help them draft claims to be filed against consumers; and (3) refer them to debt collection law firms, which then file arbitration claims

against consumers in The Forum. In soliciting creditors to use its arbitration services, The Forum makes representations that align itself against consumers, including, for example, that "[t]he customer does not know what to expect from Arbitration and is more willing to pay," that consumers "ask you to explain what arbitration is then basically hand you the money," and that "[y]ou [the creditor] have all the leverage [in arbitration] and the customer really has no choice but to take care of the account."

16.     The common ownership and control was concealed from the consumers against whom the "arbitration proceedings" were brought. It did not become known until July 14, 2009, when the Attorney General of Minnesota filed a lawsuit disclosing it.

17.     Instead of letting consumers know of the relationship between the companies appearing before The Forum to collect debts, The Forum itself, and the lawyers representing the claimants against consumers, the consumers are told through mailings and wires that "The Forum is an independent and impartial organization, which does not give legal advice or represent parties." This is absolutely false, and comprise the requisite predicate acts under 18 U.S.C. §§ 1341 and 1343 for liability to attach under 18 U.S.C. § 1962 and 1964. Moreover, the inherent conflicts in this scheme are so intertwined with the judicial actor of enforcement of arbitration awards so as to constitute state action for the purposes of procedural due process analysis. The interest of The Forum in the outcome of arbitrations before it violates the most basic tenet of due process which is the right to a fair trial in a fair tribunal. See, Caperton v. A.T. Massey Coal Co., Inc., 129 S.Ct. 2252, 2259 (2009).

6

## PARTIES

18.    Plaintiff Roger A. Shuler is a resident of Shelby County, Alabama.  Plaintiff has been a victim of the practices complained of in this action, all of which occurred in Alabama.  Potential class members are residents of Alabama and other states where the Defendants have committed acts of wrongdoing and misconduct.

19.    Defendant National Arbitration Forum, Inc. is a privately held, for-profit Minnesota corporation. The Forum's registered address and principal place of operations is 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426. The Forum is the holder of the assumed name "National Arbitration Forum" and also does business under the names "National Arbitration Forum" and "Forum."

20.    Defendant National Arbitration Forum, LLC ("NAF, LLC") is a privately held, for-profit Delaware limited liability company. NAF, LLC's registered address and principal place of operations is the same as The Forum's: 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426. NAF, LLC's registered agent is Michael Kelly. NAF, LLC also does business under the name "National Arbitration Forum."

21.    Defendant Dispute Management Services, LLC, d/b/a Forthright ("Forthright") is a privately held, for-profit Delaware limited liability company. Forthright's registered address and principal place of operations is the same as The Forum's and NAF, LLC's: 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426. Forthright's registered agent is the same as NAF, LLC's: Michael Kelly.

22.     Defendant FIA Card Services, N.A. is a bank with principal offices at 1100 North King Street, Wilmington, Delaware 19801. It was formerly known as MBNA America Bank, N.A., changing its name on June 10, 2006.

23.     Defendant Mann Bracken, LLP is a debt collector organized as a Delaware limited liability partnership, with principal offices at 702 King Farm Blvd., Rockville, Maryland 20850.   Its registered agent is the Corporation Trust Incorporated, 300 East Lombard Street, Baltimore, Maryland 21202.  It is the successor by merger to, among other entities, a debt collector known as "Eskanos & Adler."

24.     Defendant Portfolio Recovery Associates, LLC ("Portfolio Recovery") is a debt collection firm.  Its registered address and principal place of business is 120 Corporate Boulevard, Norfolk, Virginia 23502.  Portfolio Recovery does business in Alabama.  At all times relevant hereto, Portfolio Recovery was engaged in the business as a consumer debt collection enterprise.

25.     Whenever this complaint alleges that any defendant did any act or thing, it is meant that it, its directors, officers, agents, or employees or the directors, officers, agents, or employees of its subsidiaries or affiliates, performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that defendant.

## **FACTUAL BACKGROUND**

8

26.     Through the investigatory efforts of the Minnesota Attorney General's lawsuit (attached hereto as Exhibit "A") and the accompanying Consent Decree entered four days later (attached hereto as Exhibit "B,") and further supported by the House of Representatives Staff Report of the Domestic Policy Subcommittee Majority Staff Oversight and Government Report Committee, entitled "Arbitration Abuse: an Examination of Claims Files of the National Arbitration Forum" (attached hereto as Exhibit "C"), the following facts surfaced to unveil the scheme devised to deprive consumers of their opportunity for a fair and impartial resolution of their disputes.

Minnesota Attorney General's Complaint

**The National Arbitration Forum**

27.     The National Arbitration Forum—headquartered in St. Louis Park, Minnesota—is comprised of three companies that effectively operate as one: Defendants The Forum, NAF, LLC, and Forthright.

28.     The Forum is the nation's largest provider of consumer debt collection arbitrations. Most of the arbitrations conducted by The Forum involve claims by credit card companies, debt buyers, and other creditors against ordinary consumers.

29.     Credit card and other companies place language in the fine print of their customer agreements that requires consumers to arbitrate any future disputes—often in The Forum—thereby causing consumers to forfeit the right to have the dispute resolved by a judge or jury. When a company with a predispute mandatory arbitration clause in its

customer agreement decides that the consumer owes a debt that cannot be collected

through other means, it may initiate a consumer collection arbitration in The Forum, or it

may sell the debt to a third party, who may initiate arbitration in The Forum. Regardless,

these companies are often represented by outside debt collection law firms.

30.     National credit card companies are some of the most prolific users of the

National Arbitration Forum. Examples of credit card companies that have used The

Forum to process consumer debt collection arbitrations under predispute mandatory

arbitration clauses include MBNA/Bank of America, JP MorganChase, Citigroup,

Discover Card, Deutsche Financial, and American Express, among others.

31.     Increasingly in recent years—in part as a result of The Forum's aggressive

outreach to creditors—other industries have used The Forum's services to bring claims

against ordinary consumers, including, for example, mortgage lenders, retailers who lend

money to consumers to buy their products, debt buyers, and cell phone companies.

32.     As set forth below, The Forum has actively encouraged credit card and

other companies to place mandatory arbitration clauses in their customer agreements and

has actively encouraged business clients to steer arbitration filings to The Forum.

33.     The Forum is intimately involved in the arbitration process. Arbitrations

conducted by The Forum are governed by a Code of Procedure (the "Code")—a Code

drafted by The Forum. Under the Code, The Forum purports to act like a clerk of court

and coordinates the arbitration process.

10

34.     The Forum dictates and controls the arbitration process. For example, The Forum handles important aspects of the arbitration process, including scheduling of hearings, selection of the arbitrator (unless the parties otherwise agree), and dismissal of claims or responses. The Forum charges fees to consumers to participate in arbitration. As described below, it markets to and assists companies in ways that would not be tolerated if done by a court of law.

35.     The Forum claims that it has been appointed as the arbitrator in "hundreds of millions of contracts." The Forum resolves important claims that affect the lives of ordinary citizens. In 2006, it processed over 200,000 consumer collection arbitration claims. Its arbitration practices have been sharply criticized by consumer groups and consumers and have been the subject of numerous exposes and reports. One of The Forum's officers, Edward Anderson, claimed to the hedge fund managers who eventually acquired an interest in it that: "The Forum is one of a kind; there is no competitor nor is there likely to be one....The barriers to entry border on being insurmountable...."

**The National Arbitration Forum Promotes Itself as Independent, Neutral, and Not Affiliated with any Business that Uses Its Services.**

36.     In its marketing efforts and elsewhere, The Forum has deliberately created the widespread—but false—perception that it is not affiliated with or beholden to companies that use its services.

37.     These claims are placed conspicuously on multiple websites associated with The Forum, including www.adrforum.com, www.forthrightsolutions.com, and

11

www.arbitrationanswers.com. The Forum's false representations are also prominently

displayed in other forms of advertisements, public statements, and elsewhere.

38.    The following is a typical representation of independence and neutrality found

on  The Forum's website:

Q:  Is the Forum affiliated with credit card companies or other businesses that
use pre-dispute arbitration agreements?

A: **No. The Forum is an independent administrator of alternative dispute
resolution services....** The Forum administers cases and ensures the cases
proceed quickly and smoothly according [to] the rules of the arbitration or
mediation agreement. Our dispute resolution processes are designed to provide
both parties with an equal opportunity to prevail. **We are not beholden to any
company or individual that utilizes our services."** (Emphasis added.)

39.    Similar claims of The Forum's independence and neutrality abound on its

website and elsewhere:

·       **"Impartiality** and integrity. The Forum is **independent and neutral.** It
is **not affiliated** with any party." (Emphasis added.)

·       "Our Statement of Principles illustrates how The Forum, **as a neutral
administrator of arbitration proceedings,** provides due process and remains
neutral and fair." (Emphasis added.)

·       "PRINCIPLE  4.  INDEPENDENT  ADMINISTRATION.  **An
arbitration should be administered by someone other than the arbitrator
or the parties themselves."** (Emphasis added.)

·        "The Forum has **no contracts with any party** to any arbitration...."
(Emphasis added.)

·       "The Forum...[has]  no relationship  with  any  party  who  uses  our
services."

12

· "Administrative Independence. Staff members of the National Arbitration Forum operate in a manner **analogous to court clerks and administrators.** They are **independent** of any party and have **no relationship of any type** with any arbitrating party...." (Emphasis added.)

· "As **one of the world's largest neutral administrators of arbitration services,** The Forum is setting a new standard for civil dispute resolution within the American justice system." (Emphasis added.)

40.     In addition, The Forum claims that it is not affiliated or aligned with, owned by, and does not counsel any company that files an arbitration claim in The Forum:

· **"The Forum is not affiliated with any party.** The Forum is compensated on a case-by-case basis only for doing the work associated with administering mediations, arbitrations and other ADR proceedings." (Emphasis added.)

· "Who is the National Arbitration Forum? **The Forum is not a party to an arbitration claim and is not affiliated with or owned by any party who files a claim with The Forum."** (Emphasis added.)

· "As a **neutral** arbitration administrator, The Forum has no exclusive client relationships. **We do not contract with, represent or counsel our users, whether they are businesses or individuals."** (Emphasis added.)

· **"Far from being aligned with lenders and other business parties,** the NAF and its affiliated arbitrators provide **neutral** and unbiased dispute resolution services." (Emphasis added.) (Written comments submitted by NAF, LLC's managing director to the Federal Trade Commission dated August 13, 2007.)

41.     Similarly, The Forum claims that it does not receive any money from any source, except for the fees paid for its arbitration services:

· **"The Forum receives no funds from any source,** other than fees paid for dispute resolution services." (Emphasis added.)

· "Q: Why does The Forum charge fees for its arbitration services?

13

A:      The Forum's revenue is derived solely from the fees we charge for our administrative services. There are different fees for filing cases, commencing cases, arranging hearings, and processing requests and arbitration decisions. **We have no other source of revenue and we have no relationship with any party who uses our services."** (Emphasis added.)

42.     Furthermore, building on its claims of independence and neutrality, the National Arbitration Forum asserts that arbitration in The Forum is similar to or better than court:

·        "One of The Forum's dispute resolution services, arbitration, **is procedurally very similar to court."** (Emphasis added.)

·        "The core due process procedures that exist in FORUM arbitrations are identical or substantially similar to the due process procedures available in judicial and administrative law dispute resolution systems.... These arbitral procedures provide **truly excellent due process protections, and meet or exceed the rights parties would have in any court or before an administrative law judge."** (Emphasis added.)

·        "Alternative dispute resolution (ADR) is a **more efficient, predictable and amicable way to resolve conflicts and achieve legal decisions without the expense and inconvenience of going to court."** (Emphasis added.)

·        **"The Forum resolves disputes in a manner that is faster, simpler, and less expensive** than traditional courtroom litigation." (Emphasis added.)

**The National Arbitration Forum Is Affiliated with One of the Country's Major Debt Collection Enterprises.**

43.     There are a number of companies described in this Complaint that are not parties to the lawsuit. Their affiliation with The Forum, however—which began with discussions in 2006—plays an integral role in the violations alleged herein. These

14

companies—Accretive, Agora, and Axiant—were all organized by an investment manager named J. Michael Cline of New York City.

44.     Accretive II GP ("Accretive")  is a family of private equity funds based in New York City that operates under the control of Cline and his associates. A number of the Accretive entities were originally organized in 1999.

45.     Agora Fund I GP, LLC ("Agora") is a family of private equity funds based in New York City that was created by Cline and his associates through the Accretive network. The Agora entities were formed in 2007 to acquire significant financial interests in the National Arbitration Forum.

46.     Axiant, LLC ("Axiant") is a debt collection agency in which Accretive has majority ownership and which was created by Accretive to acquire the assets of three large national debt collection law firms (Mann Bracken (based in Atlanta. Georgia), Wolpoff & Abramson (based in the District of Columbia), and Eskanos & Adler (based in California)). Those firms eventually all merged into Mann Bracken.

47.     Accretive, Agora, Axiant, The Forum, and Mann Bracken form a complex web of companies that compose some of the largest debt collectors and arbitrators of consumer credit card debt in the country. In 2006, The Forum arbitrated over 200,000 claims involving credit card and other debt issued by national banks and large corporations; in almost 60 percent of those cases, the banks, or the funds that purchased the consumer debt, were represented by Mann Bracken or Wolpoff & Abramson.

15

48.     One document setting forth the business plan for Accretive's investment in The Forum describes the goal as placing The Forum "at the center of a broad arbitration ecosystem."  These ties are further described and depicted in "Chart 1" attached.

**The New York Hedge Fund Group Plans for the National Arbitration Forum to "Sit at the Center of a Broad Arbitration Ecosystem."**

49.     Beginning in 2006 and through 2007, there were a series of meetings involving Accretive (the family of New York private equity funds under control of Cline and his associates), The Forum, and three large national law firms: Mann Bracken, Wolpoff & Abramson, and Eskanos & Adler.

50.     As a result of these meetings, Accretive formed several equity funds under the name Agora, which in turn invested $42 million in The Forum and obtained governance rights in it. The three large national debt collection law firms then merged into Mann Bracken, which in turn sold its assets and collections operations to Axiant, a company formed and owned by Accretive. These transactions are further described below.

51.     In June 2006, principals of Accretive, LLC met in Minnesota with Edward Anderson and Michael Kelly, officers of the National Arbitration Forum. Accretive told The Forum that it was "excited by the range of expansion opportunities" presented by a potential financial relationship between the fund and The Forum. In particular, the Accretive principals told The Forum that a relationship between Accretive and The Forum "could catalyze [a] major transformation in many of the biggest legal sub-markets." Among other things, Accretive promised The Forum that it could provide it with "introduction to legal collections

16

individuals" and stated that "we believe Accretive would be a great partner to help NAF become a billion-dollar company." An e-mail following up on the meeting was sent to The Forum from an Accretive e-mail address.

52.     Thereafter, on August 28, 2006. J. Michael Cline—the managing member of Accretive, LLC—presented Forum executive Edward Anderson with a formal outline of a proposed "equity transaction" between Accretive, LLC and The Forum. The proposal—which is on Accretive letterhead—states that, "We [Accretive] have spent considerable time researching the legal collections and arbitration markets and are very impressed by the NAF and the unique position you have created in the industry....We believe Accretive would make an ideal partner for the NAF team and that we can help significantly accelerate the creation of value for NAF."

53.     Under the proposal, Cline's company—Accretive, LLC—would acquire a 40 percent ownership interest in The Forum and the right to appoint two members to its board of directors. Accretive promised to play an "active role in landing new customers" and to "leverage [the] Accretive network for introductions" and set forth a plan in which:

·      "NAF becomes the primary venue for resolution of high-volume, low-ticket disputes"

·      "In established markets, such as credit card, NAF exploits clause placements and becomes the preferred collections tactic where speed and cost are critical considerations. Arbitration should capture at least 50% of the volume currently placed in litigation"

·      "In new industries, such as healthcare, NAF Procedures are used early and consistently as the standard method for resolving payment disputes. By

17

playing a prominent role, NAF fundamentally shapes the collections players and tactics that emerge in these industries"

·       "NAF sits at the center of a broad arbitration ecosystem, giving rise to a range of specialist firms that serve as sources of cases or as post-award processors"

·       "Arbitration expands to become a comprehensive, alternative legal system."

(Excerpts from the August 2006 proposal are attached in Exhibit A hereto) *(See* Complaint Exhibits at 001-003).

54.     Accretive also promised to "launch" The Forum into new lines of business, such as arbitration of health care disputes between patients and hospitals, through Accretive Health, which provides collection services to hospitals.

**A.   The National Arbitration Forum Was Divided into Three Entities that Effectively Operate as One in Order to Camouflage the Significance of the Hedge Fund Ownership.**

55.     The Forum—aided by principals of Accretive—thereafter went to great lengths to concoct an elaborate corporate structure that conceals—but does not legitimize—the affiliations that undermine its claims of independence and neutrality.

56.     For example, for most of its existence, defendant NAF, Inc. operated as a stand-alone company. As part of the transaction between The Forum and Accretive, both companies created new companies that would conceal the affiliation between them. The Forum formed Forthright, and Accretive formed Agora. As a result, at no time is Accretive publicly disclosed as an owner of The Forum.

57.    Under the scheme, defendant Forthright purports to be the arbitration processing/marketing company and another defendant company, NAF, LLC, purports to retain the arbitrators. A third defendant (NAF, Inc.) has an ownership interest in the other two Defendants.

58.    In fact, the three Defendants—The Forum, NAF, LLC, and Forthright—effectively operate as one enterprise. As set forth below, NAF, Inc. and Forthright directly profit from the arbitrations conducted by the enterprise. The companies are closely interconnected, having, among other things, a common venture, common ownership, the same office space, common executive leadership, and the same registered agent. NAF, LLC and Forthright are also linked by an extensive Services Agreement (one which was required by the Accretive principals).

59.    **Common office space**. As noted above, the three defendant corporations share office space at 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426.

60.    **Common ownership, officers, and directors**. The Forum owns 100 percent of NAF, LLC and 58.3 percent of Forthright. The three companies have key principals in common.  For example:

·       Michael Kelly is the CEO of The Forum, the CEO of Forthright, and the registered agent of both NAF, LLC and Forthright.

·       Edward Anderson is Chairman, CFO, a director and a shareholder of The Forum and Chairman, Executive Vice President, director and a board member of Forthright.

19

·   Roger Haydock is an officer, director, and shareholder of The Forum and the sole officer and a director of NAF, LLC.

·   Edwin Sisam is a director and shareholder of The Forum and a director of NAF, LLC.

·   Keith Kim is a director and shareholder of The Forum and a director of Forthright.

·   William Franke is a director and shareholder of The Forum and a director of Forthright.

61.   **Services Agreement.** Forthright and NAF, LLC entered into a Services Agreement dated June 27, 2007. A Restated Services Agreement, which amended the original, is dated July 1, 2007. The hedge fund managers helped to write the Services Agreement. Under the Restated Services Agreement, Forthright controls most aspects of the arbitration administration, including:

·   *Finance and accounting.* Forthright performs all necessary bookkeeping and accounting services for NAF, LLC, including payroll, purchasing, financial reporting, billing, and collections.

·   *Operational assistance and support.* Forthright provides the personnel. facilities, and equipment to perform all management and administrative functions of NAF, LLC.

·   *Information technology.* Forthright provides and maintains all necessary IT systems necessary to support arbitrations.

·   *Management consulting.* Forthright provides senior executive management services required by NAF, LLC, including strategic planning for business growth, business development, and acquisitions.

·   *Marketing consulting.* Forthright provides all marketing resources, materials, and services for NAF, LLC.

20

·       *Human resources administration.* Forthright provides all recruiting, interviewing, hiring, employment administration, labor contract negotiations and administration, and fringe benefits administration.

·       *Legal and tax consulting.* Forthright provides all legal and tax consulting and coordinates all legal services.

·       *Intellectual property.* Forthright provides all software, applications, databases, web products, trade secrets, trademarks, know how, and other proprietary information necessary for arbitrations.

62.     The Services Agreement is for an initial period of five years and is automatically extended for subsequent five year periods (unless cancelled pursuant to its terms). NAF, LLC pays Forthright a substantial fee for its services. The fee is broken down into two parts: a monthly seven-figure fee and a "success fee" based on a formula related to the amount of revenue received by NAF, LLC. Thus, Forthright profits directly from the arbitrations conducted by The Forum (and so do the Accretive principals, as described below).

63.     One of the Accretive principals described the payments from NAF, LLC to Forthright under the Services Agreement this way: "95% of revenue [goes to Forthright] after direct-arbitrator (mediator) costs."

64.     Many of those now working for Forthright have the same duties as when they worked for The Forum. This is by design. Forthright states on its website that it "handles all arbitrations and mediation transaction processing and claims administration" for The Forum. The Forum states on its website that Forthright "serves as the exclusive provider of all

necessary services to optimize the process and the administration of [The] Forum arbitration and mediation claims." The Forum's internal announcement regarding the "restructuring" stated that "current work will remain unchanged."

65.     For example, the job duties of the former in-house legal counsel to The Forum, who became the in-house legal counsel to Forthright, remained the same: "[Y]ou may have noticed that our company name and email address has changed as Forthright is now the authorized administrator for The Forum. My job duties and other contact information remain the same." The Forum delayed issuing a news release about the creation of Forthright for about a year—and only did so after a reporter began to ask questions about the identity of The Forum's investors.

**B.      Agora/Accretive Buys Into Forthright**

66.     As set forth below, Accretive, LLC—in addition to having Agora purchase a significant stake in The Forum—also created and is the majority owner of a major debt collection enterprise called Axiant, LLC—which it purchased along with the partners of the Mann Bracken, LLP law firm, one of the country's largest debt collection law firms.

67.     In 2006, The Forum executives recognized the problems that would arise if Accretive's investment in The Forum—and its ties to the Mann Bracken law firm—became public. Indeed, The Forum executives emphasized that if there was the risk of public knowledge of the affiliation between The Forum and Accretive/Mann Bracken, the transaction should be unwound. As noted by The Forum executive Michael Kelly on

November 20, 2006:

> I cannot overstate our concern over the Mann Bracken relationship. Although I
> do not have any solutions off the top of my head, we should certainly plan for
> unwinding any deal in the event shared ownership becomes an acute issue.

(Attached as Exhibit 2 to the Minnesota Attorney General's Complaint  is a copy of Kelly's

November 20, 2006 e-mail) *(See* Compl. Exs. at 004).

68.     Kelly also proposed the "formation of a new fund [Agora] as the investment

vehicle (no public information connecting Accretive with the fund that ultimately acquires

and holds the minority interest in The Forum)." *(See* Exhibit 2 to the Minnesota Attorney

General's Complaint at 004.)

69.     In order to conceal the conflicts inherent with the Accretive/Forum transaction,

J. Michael Cline formed several new entities called "Agora."

70.     As set forth below, through a series of agreements, Agora purchased a 40

percent interest in defendant Forthright. As a result of this ownership and the Services

Agreement between NAF, LLC and Forthright, Agora (and the Accretive principals) profits

directly from the arbitrations conducted by The Forum.

71.     The first written agreement executed by the parties was a letter of intent signed

on January 15, 2007 by Cline through which the yet-to-be-created "Agora Funds" was to buy

a 40 percent ownership interest in the yet-to-be-created defendant Forthright. (Forthright was

not created until June 2007.) A few weeks after the letter of intent was signed, Cline formed

several Delaware companies bearing the Agora name. Beginning with the initial letter of

23

intent, Agora began to dictate important terms of The Forum's operations. For example, Agora required at paragraph B(5) of the letter of intent that Defendants NAF, LLC and Forthright enter into a services agreement "upon terms satisfactory to the Company [The Forum], Newco [Forthright] and the Investor [Agora]." As set forth above, NAF, LLC and Forthright entered into the Services Agreement on June 27, 2007. Through the Services Agreement, Forthright—and hence, Agora as an owner—profits from the arbitrations conducted by The Forum.

72.    As part of the due diligence for the transaction, Defendants provided Agora with detailed information about virtually every aspect of its arbitration business, including but not limited to information about mandatory arbitration clause placement trends, claim volume and revenue trends, customer calls, revenue, finances, personnel, judgment trends, arbitrator credentials, court rulings, and the like. Thus, even during the run-up to the transaction, the Agora/Accretive principals became privy to intimate and detailed information about virtually all the "ins and outs" of The Forum's arbitration services.

73.    The transaction was consummated in June 2007. On June 27, 2007, three Agora entities entered into a Unit Purchase Agreement with The Forum and Forthright through which the Agora entities acquired 40 percent—or 400,000 Class A units—of Forthright for $42,000,000. These purchases were made by Agora Fund I, LP (263,938 Class A units at $27,713,535); Agora Fund I Coinvestment Partners, LP (125,727 Class A units at $13,201,334); and Agora Fund I Holding Partners (10,335 Class A units at $1,085,131).

Agora's ownership in Forthright is depicted in "Chart 2" attached.

74.     The Unit Purchase Agreement is signed by The Forum through Edward Anderson as Chairman and CFO and by Forthright through Michael Kelly as CEO. As noted above, Kelly and Anderson have overlapping roles with both organizations. Kelly is also CEO of The Forum, which owns 100 percent of NAF, LLC and the registered agent of NAF, LLC. Anderson is Chairman and an officer and director of Forthright.

75.     Cline—the head of Accretive—signed the Unit Purchase Agreement as managing member of Agora Fund I GP, LLC—the general partner of all three Agora entities: Agora Fund I, LP, Agora Fund I Coinvestment Partners, LP, Agora Fund I Holding Partners. The three Agora entities, along with the general partner, Agora Fund I GP, LLC, were all formed by Cline in the State of Delaware on February 2, 2007—two weeks after the initial letter of intent was signed. The address for Agora Fund I GP, LLC is listed as 55 East 59th Street, 22nd Floor, New York, New York 10022, which was the address for Accretive.

76.     On the same day they entered into the Unit Purchase Agreement, Agora and NAF, Inc./Forthright entered into an Investors Agreement.

77.     The Investors Agreement identifies the investors in each of the Agora funds. (A redacted copy of this schedule is attached as Exhibit 3 to the Minnesota Attorney General's Complaint; it is redacted to delete the names of third-party investors who are not currently identified as having links to the debt collection enterprise described herein.) The chart of investors lists behind each Agora entity a functional Accretive *alter ego:*

- Agora Fund I, LP = Accretive II, LP
- Agora Fund I Coinvestment Partners, LP = Accretive II Coinvestment, LP
- Agora Fund I Blocker LP = Accretive II Blocker, LP

78.     Like the Agora funds, each of the Accretive entities was formed in the State of Delaware by Cline. Each listed an address at 55 East 59th Street, 22nd floor, in New York City— the address of Agora. Each has the same general partner: Accretive II GP, LLC, a Delaware LLC, also formed by Cline and of which Cline is the managing member.

79.     As shown in Exhibit 3 to the Minnesota Attorney General's Complaint, Accretive II GP, LLC—the general partner of each Accretive *alter ego*—invests in each Agora fund. Other investors in Agora Fund I Coinvestment Partners, LP include JMC Holdings, LP and Edgar Bronfman, Jr.  Bronfman is a general partner of Accretive, LLC. The "JMC" in JMC Holdings, LP stands for "J. Michael Cline."

80.     Agora and Accretive share common office space and common principals, partners, and/or members, including but not limited to Cline, Werner, Jay Haverty, and Madhu Tadikonda, all of whom are or were affiliated with Accretive, LLC, the Delaware limited liability company formed by Cline. Cline is Accretive LLC's managing partner, Werner is a general partner, Tadikonda is or was a principal, and Haverty is or was an associate.

81.     Tellingly—and consistent with reality—e-mails provided by The Forum sometimes conflate Agora and Accretive, referring to the Agora principals, partners, and/or members as the "Accretive folks." Similarly, e-mails exchanged between Agora and The

26

Forum about Forum business are sometimes sent to or from an Accretive e-mail address.

**The Accretive Principals Participate in the Operations of Forthright.**

82.     Prior to the consummation of the transaction with The Forum, the Accretive principals made clear to The Forum that "[o]ur investors have entrusted us with their funds on an assumption that we maintain a high level of governance oversight over our portfolio companies."

83.     To that end, among other documents, The Forum and the three Agora entities (through Cline) executed an Amended and Restated Limited Liability Company Agreement of Forthright (the "LLC Agreement") on June 27, 2007. Among other things, the LLC Agreement at paragraph 5.5 gives the Class A Units—(i.e., the ones held by Agora Funds)—the right to appoint two members of Forthright's five-person governing board.

84.     Also on June 27, 2007, Agora exercised this right, appointing Cline and an associate, Werner, to the Forthright board. Cline and Werner served on Forthright's board from June 27, 2007 to April 22, 2008. Two other Agora/Accretive principals—Tadikonda and Haverty—joined Cline and Werner in Forthright board meetings.

85.     The Agora/Accretive principals have been substantially involved in Forthright's operations. At the January 15, 2008 board meeting, for example, Tadikonda agreed to provide Forthright CEO Kelly with resumes for potential chief financial and chief operating officers. At the same meeting, it was agreed that Werner would assist Kelly in "examin[ing] and review[ing] the current sales process, and reviewing] the strategy the company is using

27

with each account."

86.    Similarly, at the March 4, 2008 Forthright board meeting—again attended by Messrs. Cline, Werner, Tadikonda, and Haverty—the participants discussed "methods to increase the number of large batch claims being processed by arbitrators, and changes in the process that would provide filers access to working capital." The participants also discussed "various opportunities to go after debt (issuer, debt buyer, and filer all present opportunities to steer claims into arbitration)[.]"

87.    Cline and Werner departed from the board in April 2008, around the time that a reporter began to ask questions about the affiliations between Defendants, Accretive, and Axiant. The departure was one of form rather than substance. As set forth in this Complaint, Agora/Accretive is far from a passive investor in Forthright; to the contrary, it has been active in its operations.

88.    Cline, Werner, and other Agora/Accretive principals continued to be involved in key activities of The Forum's daily operations after Cline and Werner departed from the governing board. For example, in the spring of 2009 the Agora/Accretive principals developed a "Forthright—Accretive Priorities Focus." Among other things, Accretive was to help The Forum find "new growth opportunities," such as "expansion of arbitration services" into the service and confirmation of arbitration filings and potential "small claims court administration for debt buyers." (A copy of the document is attached as Exhibit 4 to the Minnesota Attorney General's Complaint) *(See* Compl. Exs. at 006).

89.     Also this year, The Forum has informed Cline and Werner of personnel decisions, Accretive principals have helped The Forum to identify and interview a business development officer, and the Agora/Accretive principals have helped The Forum craft bids for new arbitration business.

90.     In 2008, after Cline and Werner left the board, the Agora/Accretive principals also helped craft The Forum's responses to media inquiries about its arbitration practices. This year, they helped The Forum devise "talking points" and a plan to lobby members of Congress on how to kill or weaken the proposed federal Arbitration Fairness Act, which would restrict the placement of mandatory arbitration clauses in "take-it-or-leave-it" consumer agreements— clauses from which The Forum and the Agora/Accretive principals derive substantial revenue.

91.     In addition, Agora/Accretive has requested Forthright to submit to it detailed periodic reports about key aspects of its operations. Accretive has requested similar reports to be submitted by Mann Bracken about Axiant.   As shown below, this relationship with Agora/Accretive ties The Forum to the debt collection industry. As a result, The Forum is not the independent and neutral arbitration company that it claims to be.

**The Hedge Fund Group Run by Cline, Werner, and Associates, Along with the Partners of the Mann Bracken Law Firm, Own Axiant—One of the Country's Largest Debt Collection Enterprises.**

92.     As set forth below, the Accretive funds—run by Cline, Werner, *el al.*—own the majority interest in Axiant, LLC, one of the country's major debt collection enterprises. As

further set forth below, principals of the Mann Bracken law firm own the remainder of Axiant, a Delaware LLC with headquarters in Georgia.

93.     Accretive, LLC states on its website that "Axiant's customers include many of the nation's largest financial institutions and consumer debt purchasers."   One consultant has described Accretive's acquisition of Axiant this way:   Legal restrictions have typically prohibited the buying and selling of law firms between parties other than attorneys. These barriers have limited M&A activity in the collections law firm segment until very recently.

94.     In 2007, new ground was broken. A private equity fund in New York, Accretive LLC, effectively acquired the non-legal capabilities of three collection law firms: Mann Bracken, Atlanta, Georgia, Wolpoff & Abramson, Rockville, Maryland, and Eskanos & Adler, PC, Concord, California.

95.     Today, this group of companies, now called "Axiant," promises to become the largest and perhaps most profitable in the collection law firm industry. It boasts of blue chip customers, excellent margins, and high revenue growth rates, in addition to a wide national attorney network.

96.     Mann Bracken described its relationship with Axiant in papers filed with state regulators as follows:

> In November 2006, [Mann Bracken] contributed the majority of its assets and liabilities related to its telephone collections services operations, including non-attorney personnel, to Axiant, LLC, formerly known as MB Solutions, LLC, which was a newly formed and wholly owned subsidiary of [Mann Bracken].

30

97.    The law firm that represented Mann Bracken in connection with the transaction with Axiant describes the relationship between Axiant, Accretive, LLC and Mann Bracken this way:

> HortenCC represented Mann Bracken, LLC, one of the country's largest collections law firms, in the formation of Axiant, LLC, a joint venture debt collection business owned by the Mann Bracken partners and Accretive, LLC, a New York hedge fund. The transaction required the development of a complex legal structure to comply with the regulatory requirements to which law firms and collection agencies are subject. The transaction was a first in the legal industry in that it allowed the Mann Bracken partners to monetize their ownership interests in the law firm.

98.    In filings submitted to state regulators, Axiant has stated that the Accretive group owns 68.7 percent of Axiant. The Accretive group invests in Axiant by owning and investing in a company called MB Acquisition Solution Corporation, of which Cline is President and Accretive, LLC's general counsel is Secretary. Attached as Exhibit 5 to the Minnesota Attorney General's Complaint *(See* Compl. Exs. at 007) is a chart filed by Axiant with state regulators outlining the Axiant ownership structure. It is redacted to delete Employer Identification and Social Security numbers.) Exhibit 5 lists major owners of MB Acquisition Solution Corporation—and hence, Axiant—as Accretive II, LP (the *alter ego* for Agora Fund I, LP) with 39.2 percent of Axiant; Accretive II Coinvestment, LP (the *alter ego* for Agora Fund I Coinvestment Partners, LP) with 13 percent of Axiant; and Accretive II Blocker, LP (the *alter ego* for Agora Fund I Blocker LP) with 1.37 percent of Axiant.

99.    Other Accretive entities own the remainder of MB Acquisition Solution Corporation. For example, as of October, 2008, Accretive Investors SBIC, LP reported

owning 7.5% of Axiant. *(See* Exhibit 5 at 007.) Accretive Investors SBIC, LP is a Small Business Investment Company—a privately owned investment fund authorized by the federal Small Business Administration ("SBA") to issue government financing to small businesses. In fiscal year 2004 Accretive Investors SBIC, LP obtained approval from the SBA to issue $100,500,000.00 in financing through the SBA's Small Business Investment Corporation program. In February 2009, Accretive Investors SBIC, LP sought approval from the SBA to provide additional "equity financing" to Axiant, LLC for purposes of operating capital and debt repurchase. The SBA's approval for the financing was required under federal conflict of interest regulations because Accretive is affiliated with Axiant. Through the investment, the federal government effectively distributed money to help fund the debt collection enterprise.

100.    Axiant has told regulators that a variety of individuals and entities affiliated with the Mann Bracken law firm—one of the country's largest debt collection law firms and a filer of arbitration claims in The Forum—own the remaining 31.3 percent of the company. As shown in "Chart 3" attached hereto and Exhibit 5 to the Minnesota Attorney General's Complaint, numerous individuals connected to Mann Bracken and its predecessor law firms have ownership stakes in Axiant, including: James D. Branton (8.19%); Stuart Wolpoff (7.58%); Ronald Abramson (7.58%); Christopher Bracken, III Grantor Annuity Trust (2.18%); and W. Christopher Bracken III (1.58%). Each of these individuals are principals, partners, and/or members of Mann Bracken or its predecessors.

101.    This ownership structure is further depicted in "Chart C" attached.

32

103.    Members of Accretive's inner circle also sit on Axiant's board of directors.  For example, Jeff Rodek, a senior advisor with Accretive, LLC, states on his resume that he is a member of Axiant's board of directors.  In addition, an unrelated company on whose board of directors Cline served states that Cline is or has been a director of Axiant.

104.    Thus, the same Agora/Accretive principals who are involved with The Forum's arbitration business are simultaneously involved in Axiant's debt collection business.

**Axiant and the Mann Bracken Law Firm Work Together to Collect Debt from Consumers and File Arbitration Claims in The Forum.**

105.    As noted above, Mann Bracken, LLP, a Delaware limited liability partnership with headquarters now in Maryland, was formed through a merger of three of the nation's top five collection law firms: Mann Bracken, LLC. Eskanos & Adler, PC, and Wolpoff & Abramson, LLP. In 2006 there were just over 214,000 consumer debt collection arbitration claims filed in The Forum: Mann Bracken and Wolpoff & Abramson filed over 125,000, or 58 percent, of those claims.

106.    Mann Bracken has been at the forefront of promoting mandatory binding arbitration as a means of collecting debt from consumers. It claims that: "In 2001, we pioneered the use of arbitration in collection matters...." It has also stated that: "Mann Bracken is a recognized leader in national arbitration collections. The use of this alternative dispute resolution can be an effective and efficient means for a creditor or debt buyer to resolve matters whereby before the only alternative was legal."

107.    Mann Bracken and Axiant work in tandem to fulfill a common purpose and joint mission. Axiant's website states that it offers "capabilities ranging from call center collections to national arbitration...through our strategic relationship with Mann Bracken, LLP...." It further states that its "strategic relationship with market-leading law firm, Mann Bracken LLP, enables Axiant to facilitate collections and recovery services to top issuers of an investors in debt products."  It states that its clients are "market leading issuers of - and investors in - debt products and portfolios" and that "Mann Bracken LLP and Axiant work in concert to serve our common clients." Under a section of its website itemizing its services, Axiant states that: "Axiant, in cooperation with Mann Bracken, LLP, a nationwide provider of legal collections and creditor's rights services" provides "national arbitration services through Mann Bracken, LLP."

108.    Mann Bracken's website is substantially similar to Axiant's. On its website, Mann Bracken states that it has a "strategic relationship" with Axiant to collect debt from consumers and that Mann Bracken is "exclusively dedicated to providing services in concert with Axiant, LLC." Mann Bracken further indicates on its website that it is "[p]owered by Axiant" and is "able to tap into 'only Axiant' capabilities...." Further, Mann Bracken states that "Mann Bracken, LLP, in cooperating with its servicing partner, Axiant LLC, provides a broad range of financial services, legal collections and recovery management solutions for its clients." including "[n]ational arbitration filing and management services."

109.    Mann Bracken has agreements with Axiant in which Mann Bracken receives

management and professional services from Axiant and in turn provides "arbitration services" to Axiant. Mann Bracken described its agreements with Axiant in papers filed with state regulators:

> Subsequent to the contribution of assets and liabilities [to Axiant], [Mann Bracken] sold a majority and controlling interest in Axiant, LLC to outside investors. As such, to continue operations [Mann Bracken] has entered into an administrative services agreement whereby [Mann Bracken] receives certain management and professional services and leases office space and equipment from Axiant, LLC. Additionally, [Mann Bracken] has entered into a legal services retainer agreement with Axiant, LLC, whereby [Mann Bracken] provides arbitration and collection litigation services to Axiant, LLC.

110.    Axiant and Mann Bracken are connected in numerous other ways. For instance, Mann Bracken and Axiant post joint job openings. In current job postings, Axiant/Mann Bracken describe Axiant as "one of the nation's premier debt collection and recovery management organizations" and that its capabilities range "from call center collections to national arbitration."

## C.    The National Arbitration Forum Hides Its Financial Ties to the Debt Collection Industry.

111.    Concerned about exposure of its financial ties to the Accretive, The Forum conceals the relationship—a relationship that is at odds with The Forum's representations of independence, neutrality, similarity to a court, and lack of ties to parties that appear before it.

112.    The Forum conceals these ties through the elaborate corporate structures described above, through its affirmative representations, and through its material omissions. As noted above, an e-mail from The Forum executive Michael Kelly in November, 2006

emphasized that there should be "no public information" connecting Accretive with Agora and, hence, The Forum.  Similarly, in 2008, when these ties came close to being uncovered by a reporter, The Forum discussed how to spin the press.  The Director of Marketing for Forthright prepared a "key messages" document containing the following misleading talking points:

> Is there any relationship between Accretive and Forthright (between Accretive and the National Arbitration Forum)?
>
> Roger [Haydock]:  This question is more appropriately directed to Mike Kelly, CEO of Forthright.
>
> Mike [Kelly]: No.
>
> (Follow up question - is there any relationship between Michael Cline - or insert other name that could be associated with Accretive and us in some way - and Forthright?)
>
> Questions about Accretive should be directed to the representatives from Accretive. (I'm not thrilled with this approach - but we can discuss.)

113.    The Forum and Agora/Accretive consulted one another on how to respond to a question from a reporter about whether Accretive has an investment stake in Forthright.  Initially, the Director of Marketing for Forthright suggested that they respond by saying that Accretive had no stake in Forthright: "Since he asks if Accretive, LLC has an investment stake in Forthright Solutions[,] I believe our answer would be that Accretive, LLC does not."  Ultimately The Forum gave the reporter an incomplete and misleading answer, layered in lawyer-speak:

> Following its spin-out from The Forum, interested investors acquired a non-

36

controlling, passive, minority position in Forthright. These several investors are primarily high net-worth individuals and endowments of major academic institutions. None of these minority investors has any control over the operations of the company. Confidentiality provisions prevent [the U.S. Attorney General] from disclosing further information about them.

114.   Agora/Accretive's investment in Forthright has never been publicly disclosed.

115.   Similarly, in 2008 The Forum worked with the Chamber of Commerce and others on "independent reports" criticizing a report by Public Citizen that questioned the integrity of The Forum's arbitration practices. The Forum described the reports as "an independent effort" even though The Forum was involved in that effort:

·       "Our role will be very background and not at all featured. This is a good thing as it will be best if no administrators are associated with ... [the report] and if the Chamber (and the Arbitration Coalition of industry supporters) are front and center on this."

·       "[W]e need to be sure (although I also want to make sure [Forum executives] know how much work you all put into this and that it wouldn't be possible without you) that we are clear that this was an independent effort."

**The National Arbitration Forum Steers Corporations to Use The Forum's Services and Provides Assistance to Them—Even Though It Represents to Consumers and the Public that It is Neutral and Independent.**

116.   Despite representing to the public that it is independent and neutral and does not "contract with, represent or counsel our users," The Forum works alongside creditors— and against the interests of consumers—to convince the creditors to include mandatory pre-dispute arbitration clauses in their customer agreements and then file claims against consumers in The Forum.  The Forum aggressively promotes its arbitration services to corporations as a collections tool, but conceals this from consumers.  In some cases, The

37

Forum assists businesses in drafting mandatory arbitration clauses, helps them in making

arbitration claims, counsels them on legal trends affecting arbitration, and refers them to debt

collection law firms, including Mann Bracken. With an already-dominant position in the

consumer credit card arbitration market, The Forum has discussed with Accretive how to "go

after" new lines of business—and pays commissions to executives who help to expand its

arbitration services into new sectors of the economy, such as health care or auto financing.

**D.    The National Arbitration Forum Actively Solicits Companies to Steer Arbitration Business To It.**

117.    The Forum earns revenue when it convinces companies to place mandatory

predispute arbitration agreements in their customer agreements and then to appoint The

Forum to arbitrate any future disputes.  The Forum actively tries to persuade corporations to

include provisions in their consumer agreements that require binding arbitration of disputes

in The Forum, thereby stripping consumers of their right to have a court resolve any

disputes.  The Forum employs a Vice President of Clause Placement and clause placement

executives, who are partially compensated on a commission basis for convincing companies

to place clauses in their customer agreements requiring arbitration of any disputes in The

Forum. The Forum also employs a Vice President of Filer Business Development and

business development executives, who similarly are partially compensated on a commission

basis for convincing clients to file arbitration claims in The Forum.   Bonuses are also paid

for getting companies in new industries like health care and auto financing to file claims in

The Forum. This is part of The Forum's business plan of expanding its arbitration dominance

beyond the credit card sector to other forms of consumer debt.

118.   Solicitations by The Forum take many  forms,  including e-mail  messages, PowerPoint presentations, and in-person meetings.

119.   The Forum's solicitations to corporations often characterize The Forum's arbitration services as a collections tool:

·   "[M]any credit card issuers are using arbitration as a collection tool for both pre-charge off and post-charge off debt." (E-mail to bank.)

·   "The Arbitration Alternative: Using FORUM Arbitration in Collections." (PowerPoint presentation to bank.)

·   "How is arbitration currently used as a part of the collections cycle?" (PowerPoint presentation to bank.)

·   "How can arbitration benefit the collections?" (PowerPoint presentation to bank.)

·   "Using Arbitration for Collections & Recovery - Why It's Effective." (PowerPoint presentation to retail financing company.)

120.   The Forum's solicitations also claim that The Forum's arbitration services provide an efficient and less costly way to collect debts:

·   "With filing fees starting at $25, FORUM arbitration can be a quicker, more cost effective way to resolve collection disputes than traditional litigation." (E-mail to bank.)

·   "Finally, as I'm sure you are aware, more and more of the largest card issuers are using arbitration as an efficient, cost-effective tool to resolve disputes, including collection disputes." (E-mail to bank.)

·   "[Benefits of arbitration include a] marked increase in recovery rates over existing collection efforts." (PowerPoint presentation to bank.)

·       "Arbitration can save up to 66% of your collection costs. Arbitration can save your money and your time collecting delinquent accounts.  Sixty-six percent:, according to *Corporate Cashflow*.   Saving the money you've been spending  on court costs, attorney fees, and discovery." (Advertisement.)

121.    Moreover, The  Forum's solicitations emphasize the coercive power that an arbitration clause has over consumers. For example, a PowerPoint presentation to one financial services company contains a table entitled "Reactions to Arbitration As Told By Customer Service Representatives" and features the following observations about arbitration:

·       "The customer does not know what to expect from Arbitration and is more willing to pay"

·       "They [customers] ask you to explain what Arbitration is then basically hand you the money"

·       "You have all the leverage and the customer really has little choice but to take care of this account"

122.    As noted above, The Forum's attempts to convince businesses to require that consumers forfeit their right to go to court is so persuasive that The Forum has even employed a Vice President of Clause Placement. The Forum describes "clause placement" as follows:

Clause Placement (CP) is a unique sales function that acquires new <u>filing</u> prospects by placing FORUM <u>solutions</u> [i.e., what is already productized] into contracts in strategically valuable <u>territories</u> from sales-driven marketing leads.

123.    Further, as noted above, during Forthright board meetings, the members discussed "methods to increase the number of large batch claims being processed by

40

arbitrators, and changes in the process that would provide filers access to working capital," as well as "various opportunities to go after debt (issuer, debt buyer, and filer all present opportunities to steer claims into arbitration)."

**E.    The National Arbitration Forum Assists Corporations in Drafting Mandatory Arbitration Clauses and Claims for Arbitration.**

124.   Beyond solicitations, The Forum sometimes assists businesses in drafting the mandatory arbitration clauses that appear in consumer agreements and that result in business being generated for The Forum.  The Forum  distributes drafting guides to corporations interested in including mandatory arbitration clauses into their consumer agreements.  These guides provide information on The Forum, arbitration in general, drafting tips, and sample language, among other things.

125.   One such guide distributed by The Forum  is entitled "Drafting Mediation and Arbitration Clauses - Practical Tips and Sample Language."  In this guide The Forum advises corporations that mandatory arbitration clauses should be included in all consumer agreements, because consumers are unlikely to agree to arbitration once a dispute arises:

> The most effective way for parties to make sure that disputes will be mediated or arbitrated, rather than litigated, is by agreeing to do so at the outset of their relationship, before disputes arise. As a number of commentators have noted, it is unlikely that parties will agree to alternative dispute resolution (ADR) after a dispute arises. At that stage, one party or the other will perceive that litigation offers some advantage, an advantage they will not choose to relinquish by agreeing to ADR....
>
> By including a pre-dispute mediation and arbitration clause in contracts, parties can be assured that future disputes will be routed into efficient, fair, effective forums—mediation and arbitration—rather than the lawsuit system.

41

126.    In addition, The Forum's drafting guides contain sample arbitration clauses for businesses to insert in their consumer agreements.  For example, one "Standard Arbitration Clause" of The Forum reads as follows:

> The parties agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this agreement or otherwise, and any claim or dispute related to this agreement or the relationship or duties contemplated under this contract, including the validity of this arbitration clause, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure then in effect. Any award of the arbitrator(s) may be entered as a judgment in any court having jurisdiction. In the event a court having jurisdiction finds any portion of this agreement unenforceable, that portion shall not be effective and the remainder of the agreement shall remain effective. Information may be obtained and claims may be filed at any office of the National Arbitration Forum, at www.adrforum.com, or by mail at P.O.  Box 50191, Minneapolis, MN 55405. This agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16.

127.    This and other sample arbitration clauses are made available by the National Arbitration Forum for corporations to insert into their consumer agreements.

128.    The Forum also distributes "Arbitration Starter Kits" to corporations. In these kits, The Forum recommends that corporations include mandatory arbitration clauses in their agreements. The kits advise businesses to "Place a simple clause—an arbitration clause—in every contract."

129.    In addition, the Starter Kits advise businesses that a mandatory arbitration clause will allow them to "take control of collections:" The Forum's uniform Code of Procedure ensures that awards are fast, affordable, predictable and fair—wherever the

dispute or claim arises— using the same rules and procedures for every case, every time. Starting with a simple clause—an arbitration clause—in your contracts, you take control of collections and claims...without a lawyer...from your own office.

130.    The Starter Kits also emphasize the role that mandatory arbitration clauses have on managing the risks of collections, quoting the corporate counsel for Deutsche Financial Services, who states: "We will not extend credit without an arbitration agreement. It's the only way to control the costs and manage the risks of lending and collection."

131.    Moreover, the National Arbitration Forum offers direct assistance to corporations to draft mandatory arbitration clauses for their consumer agreements:

·    "[I]f your organization is looking to revise its existing arbitration clause or is not yet using arbitration as a legal remedy, I would be more than happy to provide you with drafting tips and sample language as well as answer any questions you may have about the arbitration process." (E-mail to bank.)

·    "Has [bank] considered using arbitration as a legal remedy? If so, I would be more than happy to provide you with best practices and answer any questions you may have about the arbitration process." (E-mail to bank.)

**F.    The National Arbitration Forum Provides Other Assistance to Companies.**

132.    The National Arbitration Forum sometimes offers assistance to companies in preparing arbitration claims—i.e., the equivalent of a summons and complaint in a court of law.

133.    For example,  in  some cases, The Forum provides an Electronic Filer Liaison, who prepares draft claim forms for businesses or their lawyers.   One such Liaison sent the

following e-mail to a debt collection law firm regarding a claim for purchased Discover Card accounts:

> I have attached the initial draft of the claim form you will use on your purchased [D]iscover accounts. Please review this and make any changes necessary. Once we have agreed on the form and you have given approval I will set up this profile on our end. I will be sending you initial drafts for your other accounts shortly.

134.    The referenced attachment includes a draft arbitration claim and notice of arbitration regarding an alleged credit card debt to be filed in the National Arbitration Forum.

135.    The National Arbitration Forum has also counseled companies on legal trends affecting arbitration.   For example, in an e-mail to a bank, Forthright informs the bank that it provides periodic updates on case law and legislative issues to businesses who use The Forum:

> I would appreciate receiving a copy of the arbitration clause for our records as we maintain a database of clauses in which FORUM is named. These are separated by industry and cross-referenced with case law and legislative updates that we are tracking. Should we notice a change that might impact the application of the clause, we can provide relevant information should you need to react.

136.    The Forum also refers companies to debt collection law firms, including Mann Bracken. For example, in a PowerPoint presentation to a retailers finance company, The Forum provides contact information for so-called "Arbitration Representatives," which includes contact information for the debt collection law firms Mann Bracken and Wolpoff & Abramson.

137.    In short, The Forum reaches out to, and in some cases actively assists, the very

44

corporations that may bring collection arbitrations against consumers— outreach that is at odds with The Forum's public image of independence, neutrality, similarity to a court, and lack of ties to parties that appear before it and that is not in the best interests of ordinary consumers. Defendants' failure to disclose these ties is also a material omission.

<u>House of Representatives Oversight Committee Staff Report</u>

138.    Virtually all The Forum "consumer arbitrations" are in fact debt collection actions brought by creditors or assignees of creditors, not by the consumers themselves, and almost all consumer arbitrations are decided in the creditor's favor.

139.    Decisions in identical cases differed depending on the identity of the arbitrator to whom the claim was assigned.

140.    The Forum filings are assigned by The Forum staff. The studies of the California The Forum filings, by Public Citizen and by The Center for Responsible Lending, demonstrate that the vast majority of cases are assigned to a small number of arbitrators who routinely rule in favor of the creditors. The few arbitrators whose rulings are more favorable to consumers are given few cases or reduced numbers of cases.

141.    Arbitrators in most of claims ignored the absence of evidence of whether or not the claims were brought within the statute of limitations.

142.    Arbitrators in most of the claims ignored the lack of specific evidence of who was actually served with the notice of the arbitration.

143.    Where there was specific evidence of how the notice was served, it often

showed that the signature on the receipt was illegible, was a name different from the person who was supposed to be served, or was on one occasion an "X" and on two occasions a "John Doe."

144.    All of the arbitrators ignored evidence that should have resulted in dismissal of most of the claims (See Exhibit B to the House Subcommittee Report, attached hereto as Exhibit C).

145.    One Maine arbitrator, who did not ignore such evidence and did dismiss a lot of cases, ended up without any additional cases being assigned to him in Maine.

146.    The Forum itself did not follow its own rules and sent claims to arbitrators despite the fact that those claims should have been dismissed for failure of the creditor to serve the notice or arbitration "promptly."

147.    This disproportion may be augmented by The Forum's disqualification rule. When a case is assigned to an arbitrator whom the creditor considers unfavorable, the creditor can remove the arbitrator with a simple form letter, without any need to recite a justification. This rule can greatly increase the likelihood of a creditor gaining the assignment of a favorable arbitrator. It also provides notice to an arbitrator that he/she will get fewer cases, and consequently reduced income, in the future if his/her decisions do not become more favorable to creditors. In Maine, one arbitrator who was actually following the The Forum's rules, and dismissing cases that were deficient, found himself without any subsequent case assignments.

46

148.    The Forum case assignment is not random and appears to be designed to maximize decisions favorable to the creditors.

149.    Mass-production collection of consumer debts through arbitration is not "arbitration." It is debt collection made simpler, for the benefit of the creditor and to the detriment of consumers.

**The Forum's Arbitration Awards Are Only Effective Through The Threat Of Enforcement Which It Cannot Effectively Pursue Because The Awards Are Void**

150.    The notice of filing of arbitration by Defendants expressly threatens and states that, if an award is made against the consumer, it will seek enforcement of the award in "a court of competent jurisdiction."

151.    From the very beginning, the Forum acknowledges that the award in arbitration is nothing more than another collection method without the enforcement provided by the courts.

152.    An arbitration award is only enforceable through the Federal Arbitration Act, 9. U.S.C. § 9.  Indeed, the arbitration process is so entwined with its enforcement by the courts that the specific manner of enforcement of an arbitration award is specifically spelled out at 9 U.S.C. § 9.

153.    The representation that the arbitration awards will be enforced by courts of competent jurisdiction, and the fact that the arbitrations take the place of a judicial process binds the process to the actions of the State through the courts.

154.    However, it is perfectly clear that any award out of The Forum is tainted by the

47

incestuous relationship between the collection agencies and the attorneys who appear before The Forum as parties to the arbitrations.

## ROBERT SHULER

155.   On or about September 22, 2007, Shuler received a letter dated August 21, 2007 from a predecessor to Mann Bracken.  A true and correct copy of the letter dated August 21, 2007 is attached hereto as Exhibit "D" and incorporated by reference.  The dunning letter dated August 21, 2007 also contained an Arbitration Claim.  A true and correct copy of the Arbitration Claim is attached hereto as Exhibit "E" and incorporated by reference.

156.   The Arbitration Claim was filed on behalf of Portfolio Recovery, assignee of MBNA by Mann Bracken.

157.   Even though Shuler disputed the Arbitration Claim, The Forum found in favor of Portfolio Recovery, assignee of MBNA and client of Mann Bracken, and against Shuler. A true and correct copy of the Award is attached hereto as Exhibit "F" and incorporated by reference.  The Forum's Award expressly disavowed any knowledge of the existence of a "conflict of interest."

158.   Notwithstanding the recent revelations regarding the web of deceit orchestrated by the Collection Enterprise, Shuler had no way of knowing of the extensive efforts of the Collection Enterprise to conceal that the Award entered against him was not by the independent, neutral tribunal portrayed in MBNA's "arbitration clause."  Rather, The Forum,

as final and binding decision maker of any dispute, was merely an extension, or collection

arm, of MBNA, Portfolio Recovery and Mann Bracken.

159.    As the Collection Enterprise markets its services as a collection tool, Shuler

had fallen victim to an elaborate, but well-hidden, scheme to deny justice to American

consumers.

## THE RICO ENTERPRISE

160.    Plaintiff, the class members and Defendants are "persons" within the meaning

of 18 USC §1961(3).

161.    The Defendants are creditors, debt-buyers and high volume debt collectors that

attempt to collect debts, allegedly owed by consumers in Alabama and throughout the

country.  Collection efforts are primarily through the use of a phantom arbitration procedure,

which in reality is nothing more than a staged procedure by which the Defendants rubber

stamp the creditors' claims.  The Defendants misrepresent and conceal that the alternative

dispute resolution procedure, *i.e.*, arbitration, is nothing more a collection tool of the creditor.

162.    The Defendants conspire to conceal and suppress the true relationship of the

Defendants, thereby ensuring that the creditor will receive payment or an arbitration award

that can ultimately be confirmed as a final and binding judgment against the consumer.  All

Defendants simultaneously benefit through this procedure.

163.    Defendants have operated or managed an enterprise, namely, the "Collection

Enterprise," with the Defendants as its members, employees, associates, and co-conspirators,

49

in which they have conducted or participated, directly or indirectly, to extort, defraud, and misappropriate from Plaintiff and class members through a pattern of racketeering activity.

164.    Based upon Plaintiff's current knowledge, the following persons constitute a union or group of individuals associated in fact, that Plaintiff refers to as the "Collection Enterprise":

(1)     Defendants;

(2)     Other consumer debt creditors;

(3)     Other creditors utilizing collection services from the Defendants; and

(4)     All arbitrators who have, despite a defined "continuing duty", failed to take reasonable steps to identify and disclose conflicts of interest.

165.    This "Collection Enterprise" was formed to deprive consumer debtors of any dispute resolution procedure that affords the consumer due process and a fair opportunity to be heard.  Rather, the Collection Enterprise was formed to:

·       "become[s] the primary venue for resolution of high-volume, low-ticket disputes"

·       "In established markets, such as credit card, NAF exploits clause placements and becomes the preferred collections tactic where speed and cost are critical considerations. Arbitration should capture at least 50% of the volume currently placed in litigation"

·       "In new industries, such as healthcare, NAF Procedures are used early and consistently as the standard method for resolving payment disputes. By playing a prominent role, NAF fundamentally shapes the collections players and tactics that emerge in these industries"

·       "NAF sits at the center of a broad arbitration ecosystem, giving rise to a

50

range of specialist firms that serve as sources of cases or as post-award processors"

·       "The use of this alternative dispute resolution can be an effective and efficient means for a creditor or debt buyer to resolve matters whereby before the only alternative was legal ."

166.    The "Collection Enterprise" constitutes a legal association, as well as a group of individuals associated in fact, within the meaning of 18 U.S.C. § 1961(4).  All acts and omissions of the "Collection Enterprise" as set forth herein are imputed to, and are the acts and omissions of, the Defendants, unless otherwise indicated.

167.    The "Collection Enterprise" is an ongoing organization which engages in, and whose activities affect, interstate commerce. While the Defendants participate in and are members of the "Collection Enterprise," they also have an ascertainable structure and existence separate and distinct from the Enterprise and the pattern of racketeering alleged herein. Rather than conduct the collection activities against Plaintiff and class members in accordance with lawful processes and legal procedures, the Defendants agreed to, and did, engage in multiple illegal acts, constituting a pattern of racketeering activity, intended to unlawfully deprive Plaintiff and class membersof their opportunities for due process and a fair and impartial tribunal within which to resolve their disputes.  To this end, amongst other illegal and improper conduct, Defendants knowingly employed a phantom arbitration procedure designed to be merely a collection arm, and not an impartial tribunal, to achieve the purposes of the racketeering conspiracy.

**PREDICATE ACTS**

51

168.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud), 18 U.S.C. §1343 (relating to wire fraud)**,** 18 U.S.C. §1951 (relating to interference with commerce through extortion), and 18 U.S.C. §1952 (relating to travel in aid of extortionate conduct).  As set forth below, Defendants have and continue to engage in conduct violating each of these laws to effectuate their scheme to make consumers "pay up."

169.     In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C. §2.  As a result, their conduct is indictable under 18 U.S.C. §1341, 1343, 1951(b)(2) and 1952(a) on this additional basis.

## Violations of 18 U.S.C. §§ 1341 and 1343

170.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the postal service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the postal service or commercial interstate carriers, including, but not limited to, contracts, agreements, billing records, payments, collection letters, and dunning letters.

171.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises,

the Defendants, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things which include, but are not limited to, contracts, agreements, billing records, payments, collection letters, and dunning letters.

172.    The matter and things sent or received by Defendants via the postal service, commercial carrier, wire, or other interstate electronic media include *inter alia,* the opportunity to present a dispute before a fair and impartial tribunal. In specific, the form notices sent to consumers state that, "The Forum is an independent and impartial organization, which does not give legal advice or represent parties." This statement is utterly false.  The Forum is not independent of the collection agents before it, or their lawyers.  The Forum also has indeed given legal advice to Defendants in the form of assisting in the drafting and placement of arbitration clauses, and advice, as stated herein, as to how to proceed in arbitration.  Moreover, the notices reference The Forum's Code of Procedure, which again falsely states that it is a "fair, unbiased dispute resolution process."

173.    Other matter and things sent through or received from the postal service, commercial carrier, or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate this scheme.

174.    The Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and the class in obtaining their property for the Defendants' gain.

175.    The Defendants either knew or recklessly disregarded the fact that the

53

misrepresentation and omissions described above were material, and Plaintiff and the class relied on the misrepresentations and omissions as set forth above, by agreeing to a resolution procedure that was based upon false pretenses and a subterfuge for a scheme to benefit the Collection Enterprise.

176.    As a result, Defendants have obtained money and property belonging to Plaintiff and class members, and Plaintiff and the class members have been injured in their business or property by the Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each others' acts of mail and wire fraud.

## Violations of 18 U.S.C. §§ 1951(a) and (b)(2) and 1952(a)(3)

177.    Defendants have also carried out and/or attempted to carry out the schemes described above, and thereby obtained the property of Plaintiff and members of the class, by inducing them to part with their property out of fear of economic loss.

178.    Specifically, Defendants have caused Plaintiff and members of the class to pay amounts through fear of economic loss in threatened civil arbitrations, and the potential for even further damages payable by Plaintiff and class members.

179.    Defendants created this fear through threats, both veiled and explicit, that Plaintiff and class members will be forced to pay even additional monies that are not properly due.

180.    These threats are made more credible through the conspiracy described above.

181.    Defendants' extortionate conduct obstructs and affects interstate commerce.

182.   Defendants also travel and use the mail or other facilities of interstate commerce, and cause others to do so, with the intent of carrying on their extortion in violation of 18 U.S.C. §1951(a) and (b)(2).  As a result, Defendants have violated 18 U.S.C. §1952(a)(3) as well.

183.   As a result of Defendants' overt acts in violation of 18 U.S.C. §§1951(a) and (b)(2) and 1952(a)(3), as well as Defendants' aiding and abetting of those violations, Plaintiff and members of the class have parted with money that was rightfully theirs and have been injured in their businesses and property.

## CONSPIRACY

184.   Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy, which includes not only the Defendants, but other creditors which utilize defendant services.

185.   Each defendant and members of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of fraud and extortion to relieve Plaintiff and class members of their rightful property and actually committed such acts.

186.   Indeed, for the fraudulent schemes described above to be successful, each defendant and other members of the conspiracy had to agree to enact and utilize the same devices and fraudulent tactics against the Plaintiff and members of the class.

187.   Numerous common facts and similar activities, which reflect the schemes and

the existence of a conspiracy, exist among the Defendants and other members of the conspiracy, as demonstrated by the foregoing.

188.   During the past ten years, the conspiracy was conducted through and implemented by:  the agreements between the Defendants to conduct the activities and practices set forth above.

## PATTERN OF RACKETEERING ACTIVITY

189.   The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§1341, 1343, 1951(b)(2), or 1952(a)(3) as described above, within the past ten years.  In fact, each of the Defendants has committed or aided and abetted in the commission of tens or hundreds of thousands of acts of racketeering activity.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff and class members.

190.   The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

191.   A few representative examples of the types of predicate acts committed by Defendants pursuant to their scheme to defraud the Plaintiff and their conspiracy to violate

56

RICO are set forth above, and have been carried out daily over several years preceding this action.

192.    The predicate acts described above demonstrate the regular business practice of these Defendants.

## RICO VIOLATIONS

### §1962(a)

193.    Section 1962(a) of RICO provides that "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering . . . in which such person has participated as a principal within the meaning of §2, Title 18, U.S. Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."

194.    As set for above, Defendants receive income from their participation as principals in an extensive pattern of racketeering activity.

195.    That income is reinvested to finance future racketeering activity, and the future operation of the "Collection Enterprise."

### §1962(c)

196.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct

of such enterprise's affairs through a pattern of racketeering activity. . . ."

197.    Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the "Collection Enterprise."

### §1962(d)

198.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section."

199.    Defendants' conspiracy to secure money due the Plaintiff and class members for their own use through the fraudulent and extortionate scheme described above violates 18 U.S.C. §1962(d).

200.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the "Collection Enterprise" through a pattern of racketeering activity comprised of numerous acts of mail fraud, wire fraud, and extortion, and each defendant so participated in violation of 18 U.S.C. §1962(c).

201.    Each defendant further agreed to use or invest, directly or indirectly, part of the income derived from the acts of mail fraud, wire fraud, and extortion, which constituted a pattern of racketeering activity, into the establishment, operation, and expansion of the "Collection Enterprise," described herein and has done so in violation of 18 U.S.C. §1962(a). If the monies from the conduct of the enterprise were not reinvested into the "Collection Enterprise", it could not continue to function, and expand into the other markets it seeks to enter.

58

## CLASS ALLEGATIONS

### Class Definition

202.   Plaintiff brings this action on his own behalf and pursuant to Fed. R. Civ. P.

Rule 23(b)(1)(A), (b)(2), and/or (b)(3), as a class action on behalf of a nationwide class of

persons defined as:

> All consumers who have been subject to an arbitration conducted by The
> Forum, where the debt was being collected by Mann, Bracken, or any affiliated
> law firm, as set forth herein, Forthright, f/k/a Card Services, MBNA America
> Bank, and/or Portfolio Recovery Services, Inc. between August 31, 1999 and
> the present.

> Excluded from the class are Defendants, any officers or directors of
> Defendants, the legal representatives, heirs, successors and assigns of
> Defendants, and any judicial officer assigned to this matter and his or her
> immediate family.

### Numerosity

203.   The members of the class are so numerous that joinder of all members is

impractical and inefficient such that the requirements of Fed. R. Civ. P. Rule 23(a)(1) are

met.  Plaintiff does not know the exact number of class members, but is informed and

believes that hundreds of thousands, of consumers have been subjected to phantom

arbitration, or made subject to intimidating tactics and threats surrounding said illegal

arbitration. The class is ascertainable as the names and addresses of all class  members can be

identified in business records maintained by the Defendants.

### Commonality

204.   The questions of law and fact common to the class include, *inter alia*:

59

a) whether Defendants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein;

b) whether Defendants have engaged in mail and wire fraud;

c) whether Defendants induced Plaintiff and class members to part with their property out of fear of economic loss so as to violate 18 U.S.C. §1951;

d) whether Defendants have engaged in interstate travel to effectuate their extortionate acts so as to violate 18 U.S.C. § 1952;

e) whether Defendants engaged in a pattern of racketeering activity;

f) whether the "Collection Enterprise" is an enterprise within the meaning of 18 U.S.C. §1961(4);

g) whether Defendants have used or invested income from the racketeering activities to establish or operate the "Collection Enterprise" in violation of 18 U.S.C. § 1962(a);

h) whether Defendants conducted or participated in the affairs of the "Collection Enterprise" through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

i) whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting and/or direct acts in violation of 18 U.S.C. §1962(a)(c) proximately caused injury to Plaintiff's and class members' business or property;

j) whether Defendants act and/or refuse to act on grounds generally applicable to the Plaintiff and class members.

k) whether Defendants fraudulently concealed their scheme;

l) whether Defendants are unjustly enriched by their scheme;

m) whether the Plaintiff and other class members are entitled to restitution of amounts collected by Defendants; and

n) whether the court should grant injunctive relief to Plaintiff and class

members to prevent the Defendants' ongoing conduct.

The requirements of Fed. R. Civ. P. Rule 23(a)(2) are met.

## **Typicality**

205.    The claims of the representative Plaintiff are typical of the claims of the class as a whole.  If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.  Plaintiff is a member of the class and has suffered harm due to the unfair, deceptive, and unconscionable collection practices of Defendants.  The requirements of Fed. R. Civ. P. Rule 23(a)(3) are met.

## **Adequate Representation**

206.    The representative Plaintiff is willing and prepared to serve the Court and proposed class and sub-classes in a representative capacity with all of the obligations and duties material thereto, pursuant to Fed. R. Civ. P. Rule 23(a)(4).  The interests of the representative Plaintiff are consistent with and not antagonistic to the interests of the class. The class representative has retained counsel experienced in prosecuting class actions and complex consumer litigation.

## **RULE 23(b)(1)**

207.    The prosecution of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as

a practical matter, be dispositive of the interests of other members of the class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

208.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the parties opposing the class.  Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof, and legal theories would also create and allow to exist inconsistent and incompatible rights within the Plaintiffs' class.

## RULE 23(b)(2)

209.    The Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

## RULE 23(b)(3)

210.    The questions of law and fact common to members of the class and sub-classes predominate over any questions affecting only individual members.

211.    A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that individual claims by the class members are impractical as the costs of pursuit far exceed what any one Plaintiff or class member has at stake.  Therefore, certification under Fed. R. Civ. P. Rule 23(b)(3) is appropriate.

## COUNT I

*Violations of the Racketeering and Influence Corrupt Organizations Act,18 U.S.C. § 1961 et seq.*

212.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

213.   At all times relevant to this complaint, the "Collection Enterprise" was, and continues to be, an enterprise as defined by 18 U.S.C. § 1961(4), and has engaged in, and continues to engage in, activities that affect interstate and foreign commerce.

214.   Defendants, acting as the members, employees, associates, and co-conspirators of the enterprise, have sought to deprive Plaintiff and class members of their right to a fair and impartial tribunal within which to resolve their disputes.

215.   Defendants have each knowingly and willfully, agreed, conspired, and associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, by illegally and fraudulently threatening arbitration or phantom arbitration as a tool to extort or attempt to extort payments of the debt, all through a pattern of racketeering activity, which injured Plaintiff and class members, in violation of 18 U.S.C. § 1962(c) and (d).

216.   As described above, the pattern of racketeering involved various, and continuing acts of illegal activity including, but not limited to, acts of:

Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 through threats designed to place consumers in fear of economic loss;

Wire and mail fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1346;

63

217.    These acts occurred beginning in at least 2003, continue through the present and pose a threat of continued criminal activity intended to extort and coerce the payment of monies through wrongful conduct and illegal processes.

218.    As a result of the pattern of continuing racketeering activity, Plaintiff and class members have suffered damage, and will likely suffer additional injury if Defendants' conduct continues.

## COUNT II

### *Violations of the Racketeering and Influence Corrupt Organizations Act, 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. §§ 1962 (a) and (c).*

219.    Plaintiff and class members incorporate and reallege the paragraphs above as if fully set out herein.

220.    In violation of 18 U.S.C. §1962(d), Defendants have, as set forth above, conspired to violate: 18 U.S.C. §1962(a) by using and investing income received from a pattern of racketeering, directly or indirectly, to establish and operate the "Collection Enterprise," which is engaged in and whose activities affect, interstate commerce; and 18 U.S.C. §1962(c) by conducting or participating directly or indirectly in the conduct of and the affairs of the "Collection Enterprise" through a pattern of racketeering.

221.    As a direct and proximate result, Plaintiff and class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering and their investment and re-investment of income therefrom to operate, expand, and perpetuate the "Collection Enterprise."

64

222.    Plaintiff and class members have been injured by the illegal and unlawful conduct and misrepresentations of the Defendants.

## COUNT III

### *Violations of 18 U.S.C. §2 by Seeking to and Aiding and Abetting in the Violation of 18 U.S.C. § 1962 (a) and (c).*

223.    Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

224.    This claim of relief arises under 18 U.S.C. §1964(c).

225.    As set forth above, Defendants knowingly, and with shared intent, sought to, and have aided and abetted each of the other Defendants in the commission of predicate acts, in engaging in a pattern of racketeering activity, and in violating 18 U.S.C. §1962 (a)and (c) as described above.

226.    As a result, under 18 U.S.C. §2, the RICO violations of each defendant are those of the others as if they had been committed directly by them.

227.    As a direct and proximate result of the fact that each defendant aided and abetted the others in violating 18 U.S.C. §1962(a) and (c), Plaintiff and class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering and their investment and reinvestment of income therefrom to operate, expand, and perpetuate the "Collection Enterprise."

228.    Plaintiff and class members have been injured in their business or property by the wrongful and unlawful conduct of the Defendants.

## COUNT IV

### *Violations of RICO 18 U.S.C. §1962(a) and (c)*

229.   Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

230.   This claim for relief arises under 18 U.S.C. §1964 (c).

231.   As set forth above, Defendants have violated 18 U.S.C. §1962(a) by using and investing income received from a pattern of racketeering, directly or indirectly, to establish and operate the "Collection Enterprise," which is engaged in, and whose activities affect interstate commerce, and have violated 18 U.S.C. §1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the "Collection Enterprise" through a pattern of racketeering.

232.   As a direct and proximate result, Plaintiff and the class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering activity and their investment and reinvestment of income therefrom to operate, expand, and perpetuate the "Collection Enterprise."

233.   Plaintiff and class members have been injured in their business or property by the wrongful and unlawful conduct of the Defendants.

## COUNT V

### *Civil Conspiracy*

234.   Plaintiff incorporates by reference herein the preceding paragraphs of this

Complaint.

235.    Defendants willfully, knowingly, and intentionally agreed and conspired with each other for the purpose of engaging in unlawful conduct, for unlawful purposes, including acts of extortion and fraud, the furtherance of their scheme, and for the purpose of engaging in otherwise lawful conduct by wrongful conduct and means.

236.    Defendants committed the acts alleged pursuant to, and in furtherance of, that agreement and furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

237.    As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiff and class members have suffered injury, damage, loss, and harm.  The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

238.    Defendants' intentional agreement to commit, and the commission of, these wrongful acts was willful, malicious, oppressive, and in wanton and conscious disregard of Plaintiff's and class members' rights.  Plaintiff and class members are, therefore, entitled to an award of punitive damages to punish their wrongful conduct and to deter future wrongful conduct.

239.    As a result of Defendants' actions, Plaintiff and class members have been damaged in an amount to be proven at trial.

## COUNT VI

### *Aiding and Abetting*

240.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

241.   Defendants had full knowledge of or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including acts of extortion, fraud, and conspiracy by providing substantial assistance and by encouraging the others to act.

242.   As a direct and proximate result of the aiding and abetting of these acts, Plaintiff and class members have suffered injury, damage, loss, and harm.  The wrongful conduct aided and abetted by these Defendants was a substantial factor in causing this harm.

243.   Defendants' aiding and abetting of these wrongful acts was willful, malicious, oppressive, and in wanton and conscious disregard of Plaintiff's and class members' rights. Plaintiff and class members are, therefore, entitled to an award of punitive damages to punish their wrongful conduct and to deter future wrongful conduct.

244.   As a result of Defendants' actions, Plaintiff and class members have been damaged in an amount to be proven at trial.

## COUNT VII

### *Declaratory and Injunctive Relief Under 18 U.S.C. § 1964(a)*

245.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

246.   His claim arises under 18 U.S.C. §1964(a), which authorizes the District

Courts to enjoin violations of 18 U.S.C. §1962, and under 28 U.S.C. §2201 which authorizes associated declaratory relief.

247.   As set forth in Counts II through IV above, Defendants have violated 18 U.S.C. §§1962(a), (c) and (d) and will continue to do so in the future.

248.   Enjoining the Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate as the Plaintiff and class members have no adequate remedy at law and will, as set forth above, suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

249.   As a result of Defendants' illegal collection practices, Plaintiff and class members have suffered and will continue to suffer severe and irreparable injury and harm.

250.   Accordingly, Plaintiff and class members seek a permanent injunction ordering Defendants to cease and desist:

a) efforts to arbitrate consumer claims in The Forum or any related entities;

b) efforts to enforce any amounts awarded by the Forum;

c) efforts to collect any amounts that are the subject of the illegal arbitration agreements; and

d) order the Defendants to satisfy any and all awards confirmed by the Defendants, or any party related thereto, that were the subject of The Forum's arbitration procedures.

## COUNT VIII

### *Unjust Enrichment*

251.   Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

252.   The Defendants had engaged in wrongful and illegal collection activities, including phantom arbitration procedures and used extortionate practices to collect property from the Plaintiff and class members.

253.   As a result of these unlawful practices, the Defendants have been unjustly enriched.

254.   Plaintiff and class members seek disgorgement of the illicit profits, restitution in the amount of all monies and property collected from class members, and awards given to the Defendants, or any party related thereto, compensatory damages and other relief as set forth in the prayer for relief below.

## COUNT IX

### *Count to Vacaate Arbitration Awards*

255.   Plaintiff incorporates by reference, as if fully set out herein, paragraphs 1 through 254 above.

256.   The Federal Arbitration Act ("FAA), 9 U.S.C. § 1 et seq. Provides for the enforcement of arbitration agreements and awards.

257.   The FAA provides specific grounds for vacating an arbitration award. Section 10 of the FAA provides that an award may be vacated.

1.   Where the award was procured by corruption, fraud, or undue means.
2.   Where there was evident partiality or corruption in the arbitrators, or

either of them.

(9 U.S.C. § 10a).

258.    The Awards of Mr. Shuler and the class described herein are subject to being vacated pursuant to the above-referenced code section due to the collusion between the Defendants resulting in the RICO violations and due process violations described herein.

259.    Mr. Shuler, on behalf of himself and the class described herein, requests an order vacating the arbitration awards against them because they were the result of corruption, fraud, undue means, and partiality.

## COUNT X

### *Deprivation of Procedural Due Process*

260.    Plaintiff incorporates by reference, as if fully set out herein, paragraphs 1 through 259 above.

261.    The Fourteenth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property, without due process of law. U.S.C.A. Const. Amend. 14.

262.    That right to due process before being deprived of, in this case, property, has been stated as the right to be heard "at a meaningful time and in a meaningful manner."

263.    As recently as June of 2009, the United States Supreme Court has stated that, "a fair trial in a fair tribunal is a basic requirement of due process." Caperton v. A.T.

Massey Coal Co., Inc., 129 S.Ct. 2252, 2259 (2009), quoting In re Murchison, 75 S.Ct. 623, 625 (1955).

264.    As described above, neither the trial nor the tribunal are fair to the consumers in The Forum.  Indeed, the most basic tenet of fairness has been deprived of Plaintiff and the class in that The Forum and the decision maker had a direct precuniary interest in the outcome of the proceedings. Such an interest has been found sufficient for a decision that a litigant's due process rights have been violated.  Caperton.  Indeed, the Supreme Court has stated:

> Every procedure which would alter a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused, denies the latter due process of law.

Tuney v. State of Ohio, 47 S.Ct. 437, 532 (1927), quoted in Caperton, supra.

265.    There is little question that the adjudication of money judgments as The Forum does, is primarily and has traditionally been exclusively the function of the courts, who are undoubtedly state actors such that procedural due process rights attack.

266.    Similarly, arbitration agreements are specifically made enforceable by, and arbitration awards are only enforceable under the provisions of the Federal Arbitration Act 9 U.S.C. § 1-16.

267.    Without judicial enforcement of predispute arbitration clauses, and subsequent enforcement of arbitration awards, arbitration proceedings such as those initiated by The Forum are of no value.  Ultimately, Forum awards must be enforced by

the state, which makes the arbitration proceeding state action subject to due process protection. The FAA and the arbitration process are so intertwined that due process rights attach.

268.    Where a proceeding has been held that violates one of the parties due process rights, those proceedings are to be declared void, and must begin anew in a manner that comports with the due process rights of the parties.

## PRAYER FOR RELIEF

WHEREFORE, based upon the above, Plaintiff, on behalf of himself and all members of the class he represents, seeks judgment and requests that this Court grant the following relief:

(1)    For an order certifying the class, designating Plaintiff as the class representative, and Plaintiff's attorneys as class counsel;

(2)    Three times the amount of Plaintiff's and the class' economic losses resulting from Defendants' conduct described above as provided in 18 U.S.C. § 1964(c);

(3)    Permanent injunctive relief enjoining Defendants from participating in the improper and/or unlawful conduct herein alleged, from participating in any future arbitrations involving class members; and from attempting to collect any amounts previously awarded by any of the Defendants or related entities;

(4)    Compensatory and all other allowable damages, including statutory damages

under the causes of actions asserted herein;

(5)     An award of costs, expenses of litigation, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

(6)     For an order vacating and declaring void all awards made by The Forum in which Forthright, f/k/a Card Services, MBNA America Bank, and/or Portfolio Recovery Services, Inc., or any party affiliated with them appeared;

(7)     For an order requiring restitution of overpayments made by Plaintiff and class members to Defendants, and disgorgement of the money Defendants have improperly collected arising out of the proceedings described in paragraph (6) above; and

(8)   Such other and further, supplemental, alternative, different, or additional damages, pre- and post-judgment interest, costs, fees, or equitable relief as may be appropriate under the premises.

**PLAINTIFF AND CLASS MEMBERS RESPECTFULLY DEMAND A TRIAL BY STRUCK JURY.**

Respectfully submitted, this 28th day of August, 2009.

/s/ James P. Carey_____
James P. Carey  (BAR NO:  180555)
Sieben, Grose, Von Holtum & Carey, LTD.
800 Marquette Avenue, Suite 900
Minneapolis, MN 55402
(612) 333-4500
Fax (612) 333-5970
James.Carey@KnowYourRights.com

PI1#493557v1

74